**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Allen Clifton BENTON, Defendant-Appellant.**

No. 79–5576.

United States Court of Appeals, Fifth Circuit. Unit B

Feb. 23, 1981. Rehearing and Rehearing En Banc Denied April 16, 1981.

Frank J. Petrella, Atlanta, Ga., for defendant-appellant.

William L. Harper, U. S. Atty., Richard H. Dean, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before MORGAN, ANDERSON and THOMAS A. CLARK, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Allen Clifton Benton, an inmate at the Atlanta Federal Penitentiary, was indicted and tried on three counts: for murdering another inmate, William Rhett Zambito, in violation of 18 U.S.C.A. § 1111; for conveying a weapon within a federal prison in violation of 18 U.S.C.A. § 1792; and for conspiring to murder Zambito in violation of 18 U.S.C.A. § 1117. The jury acquitted Benton of the first two charges but convicted him of the conspiracy charge and the district judge imposed a life sentence. Benton raises several alleged errors on appeal. Finding no reversible error, we affirm the conviction and sentence.

## I. FACTS

Viewing the facts most favorable to the government, *United States v. Glasser*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), they appear as follows.

Prior to and during March, 1978, appellant Benton was serving an 8-year sentence at the Atlanta Federal Penitentiary for narcotics trafficking. His conviction followed a guilty plea to various drug charges entered in the United States District Court for the Northern District of Georgia. Appellant's conviction was a direct result of cooperation by Rhett Zambito, appellant's partner in the drug business and the victim in this case.

Sometime before March 2, 1978, Benton learned that Zambito would be transferred to the Atlanta prison facility. He immediately set about to make plans to kill Zambito because he feared that Zambito would implicate him in a series of drug-related homicides in Florida. He associated several other inmates to assist in the murder plot. Among his cohorts were Bobby Mulholland, John Barradale, a/k/a John the Barber, Fred Fegel, a/k/a The Fly, Tommy Genovese and Harry Flamkin. Zambito arrived at the prison on March 22. Sometime between 6:30 and 6:35 a. m. on the following day, March 23, 1978, he was discovered in his bunk bleeding from fatal lacerations about the face and throat. He died shortly thereafter.

Inmates Fegel, Flamkin and Marion Pruitt testified for the government. Fegel testified that on several occasions Benton said words to the effect that he must kill Zambito so that he could not connect him with several Florida homicides. Fegel also testified that at one point he, Benton, Mulholland and John the Barber approached another inmate to acquire a knife. On the evening of March 22, Benton and the others followed Zambito's movement about the prison. At one point Benton stated that if Zambito comes back here, "I'll choke him until his eyes pop out of his head." (Record III, p. 207). The conspirators finally decided they would get Zambito early in the morning. On the morning of March 23,

Benton approached Fegel and handed him a paper bag containing a shiny object. Still later that morning Benton advised Fegel not to worry, "[e]verything is taken care of." (Record III, p. 220). Fegel and Mulholland assisted prison employees in transporting Zambito from his cell to the hospital on a stretcher. Upon discovering that Zambito was still breathing, they purposely stalled for time in carrying the body in order that Zambito might expire before obtaining medical attention.

Harry Flamkin testified that he was acquainted with Benton. Flamkin would do favors and jobs for Benton. Several days before Zambito's death, defendant asked Flamkin to obtain some gloves from the prison hospital to keep fingerprints off the knife or whatever weapon was used to kill Zambito. Benton told Flamkin that he intended to kill Zambito. Benton also told Flamkin that he had hidden a knife in Flamkin's mattress. Although Flamkin never saw the knife, he did feel it in his mattress. Flamkin also testified that he did not think that the knife in his mattress was the weapon used to kill Zambito. Rather, he stated that Tommy Genovese gave Benton a knife the night before Zambito was stabbed to death. On the morning of Zambito's death, Benton ordered Flamkin to stand in the "cutoff" in the cell block where Zambito was housed and to divert the attention of any guard who might happen into the cellblock.

Marion Pruitt was Zambito's cellmate. On the morning of the killing, Pruitt was sleeping in the bunk beneath Zambito. He was awakened by sounds of activity in the cell. He testified that he was familiar with Benton and that Benton was standing next to the bunk. He heard Zambito say "Oh my God, no" and felt the bunk jerk as Zambito was attacked.

In addition to the statements by Benton that he had to kill Zambito to keep him from implicating Benton in Florida homicides, the government introduced the Florida indictment of Zambito for murder. The government also read into evidence, over appellant's general objection that the probative value of the evidence was outweighed by its prejudicial effect, a portion of the transcript of Benton's sentencing hearing wherein the judge advised Benton that he was under investigation for two homicides in Florida.

Benton took the stand in his own defense. He testified that he was working in the bakery at the time of the killing and denied participation in any conspiracy. John Barradale, Bobby Mulholland and Tommy Genovese all denied any participation in a conspiracy and each admitted to only a passing acquaintance with one another, Benton, Fegel and Flamkin, the alleged conspirators.

The jury acquitted Benton of the charges of murder and conveying a weapon on federal property but found him guilty of conspiracy to murder Zambito. The trial judge, apparently relying upon evidence in the presentence investigation report that Benton had participated in several drug-related homicides in Florida, sentenced him to life, the maximum possible sentence for the offense.

## II. DISCUSSION

### A. Admission of evidence of the Florida homicides.

Appellant argues that the district court erred in admitting the evidence of the Florida homicides in two respects. First, the district court failed to hold a hearing to determine the admissibility of the evidence. Second, he alleges that the district court erred in admitting the evidence under the standards for admissibility of prior crimes established in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), in that the probative value of the evidence was substantially outweighed by its prejudicial effect.

### 1. *Rule 104(c) hearing.*

■ Appellant urges reversal on the ground that the district court failed to conduct an evidentiary hearing out of the jury's presence on the admissibility of the

evidence of other homicides. Clearly Fed.R. Evid. 104(c) and our decision in *United States v. Beechum, supra,* require such a hearing; however, it appears that the district court heard from counsel on the question in chambers before the trial and permitted appellant to file a brief. These events may well satisfy the hearing requirement. In any event, "the trial court's failure to conduct a preliminary hearing is not reversible error, since this court will make a determination as to admissibility on appeal." *United States v. Black,* 595 F.2d 1116, 1117 (5th Cir. 1979).

### 2. *Admissibility of prior crimes.*

■ Fed.R.Evid. 404(b) provides:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Although evidence of other crimes may be relevant for such purposes as showing intent, motive, etc., its relevancy may be outweighed by its prejudicial effect. Accordingly, all evidence is subject to Fed.R.Evid. 403:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *United States v. Beechum, supra,* this court announced a two-step test for determining admissibility of evidence of other crimes.

First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.

582 F.2d at 911 (footnote omitted). The resolution of these questions lies within the sound discretion of the trial judge, and the decision to admit extrinsic evidence can be disturbed only for an abuse of discretion. *See United States v. McMahon,* 592 F.2d 871, 873 (5th Cir.), *cert. denied* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979). The government tendered the evidence of the Florida homicides for the purpose of showing Benton's motive for wanting Zambito killed, and the trial judge admitted the evidence for that purpose. Upon applying the *Beechum* test to our own review of the record, we conclude that the district court did not abuse its discretion in admitting the evidence.[1]

■ First, the evidence was relevant to the question of motive. Motive has been defined as "the reason that nudges the will and prods the mind to indulge the criminal intent." *United States v. Beechum,* 582 F.2d at 915 n. 15 *quoting* Slough & Knightly, *Other Vices, Other Crimes,* 41 *Iowa L.Rev.* 325, 328 (1956). *See also United States v. Day,* 591 F.2d 861, 874 (D.C.Cir. 1978). While motive is not an element of any offenses charged against appellant, it may be evidence of identity or of deliberateness, malice or specific intent which are elements of the crimes. *See McCormick on Evidence,* § 190 at 450–51 (2d ed. 1972). We believe that appellant's knowledge that Zambito might implicate him in the Florida homicides constituted a motive for appellant wanting to kill Zambito to obtain his

---

1. The government argues that *Beechum* is inapplicable to the facts in this case because the evidence of prior crimes was not introduced to prove the truth of prior crimes but only to show that Benton knew that Zambito may implicate him in those crimes regardless of the truth of Zambito's assertions. We reject this argument. The government went beyond merely showing a state of mind; it introduced

into evidence the Florida indictment charging Zambito with murder and read into evidence Benton's sentencing transcript wherein the sentencing judge made reference to the investigation of Benton concerning two homicides. We do not believe that the government's distinction can remove this evidence from the balancing process required by *Beechum* and Rule 403.

silence.[2] This evidence of motivation was relevant as tending to show the participation of appellant in the crime and to show malice or intent which are elements of the crimes charged.

■ Having established that the evidence of extrinsic offenses had probative value, we must now determine whether the incremental probative value of the evidence was substantially outweighed by its prejudicial effect. The probative value of extrinsic offense evidence may be measured by whether and to what extent the accused's motive, intent, etc. "is established by other evidence, stipulation, or inference." *United States v. Beechum*, 582 F.2d at 914. We have held that an important factor relating to probative value is the goverment's need for the evidence in proving its case. *United States v. McMahon*, 592 F.2d 871 (5th Cir.), *cert. denied* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289 (1979); *United States v. Frick*, 588 F.2d 531 (5th Cir.), *cert. denied* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 385 (1979). Prejudice relates to the likelihood that the jury's decision will be based upon improper factors, notably the character and past conduct of the accused, rather than upon the evidence presented on the crime charged. The prejudicial effect of the evidence may be reduced by the manner in which the evidence is introduced, e. g., elimination of inflammatory or unnecessary details from the presentation, and by cautionary instructions from the trial judge. *See United States v. Peltier*, 585 F.2d 314 (8th Cir. 1978), *cert. denied* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979); *United States*

*v. Free*, 574 F.2d 1221 (5th Cir.), *cert. denied* 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978).

■ Appellant argues that since the government had established that Zambito had cooperated with the government in obtaining the conviction of appellant on the drug charges, they had established a sufficient motive for appellant desiring to kill Zambito. According to appellant, the evidence of the Florida homicides had very little or no incremental probative value of motive and that any probative value of the evidence was more than outweighed by its extreme prejudicial effect. We do not agree. First, there was some testimony that Zambito had cooperated with the government in obtaining convictions of others, some of whom may also have been at the Atlanta prison. Furthermore, the desire to silence a potential homicide witness constitutes a more immediate and compelling motive for murder than retribution for past testimony or information for drug offenses. The evidence of the Florida homicides was necessary to show a motive unique to appellant. Finally, Benton's own statements to Fegel and Flamkin demonstrate that his predominate concern was to keep Zambito from testifying against him for murder. Accordingly, there was substantial need by the government of the extrinsic offense evidence.

We do not believe that the prejudicial effect of the evidence outweighs its probative value. The government was not allowed to introduce many details of the alleged homicides.[3] Throughout the trial the

---

2. The desire to silence a potential adverse witness is a frequently encountered motive for murder. *See, e. g., United States v. Harvey*, 526 F.2d 529 (2d Cir. 1975), *cert. denied* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976) and case collected in 2 *Wigmore on Evidence*, § 390 at 423–25 n. 2 (Chadbourn rev'd. ed. 1979).

3. Of some concern to us is the admission of the drug sentencing transcript where the sentencing judge made the following statement:

I have information in the presentence report which indicates that Mr. Benton is under investigation concerning several homicides in the Florida area, that he may have been in-

volved in and present when another individual shot and killed a subject, and may have assisted that individual in disposing of the body of the victim.

Also, another charge which they are investigating where they have information to believe that Mr. Benton actually cut the throat of a subject and got someone else to assist him in dismembering the body and disposing of it.

Record III, pp. 167–8. The inflammatory nature of these allegations and the similarity to the crimes charged have a propensity for jury prejudice. The transcript was read into evidence over appellant's general objection; however, the district judge invited appellant's coun-

district judge instructed the jury to consider the evidence of other homicides only on the question of motivation and not to consider it as evidence of the crimes charged. Accordingly, the district court did not abuse its discretion in admitting the evidence of other homicides to prove motivation.[4]

### B. Sufficiency of the evidence.

The appellant argues that there was insufficient evidence to support the conviction for conspiracy to commit murder. He bases his argument upon alleged inconsistencies in the jury verdict. The indictment charged as overt acts of the conspiracy (1) that appellant instructed another inmate to bring him six pairs of gloves from the hospital, (2) that appellant carried a homemade knife from place to place in the prison, and (3) that appellant killed Zambito. These latter two acts were also charged as substantive offenses of which appellant was acquitted by the jury.

▮ Viewing the evidence in the light most favorable to the government, we do not believe that the verdict is facially inconsistent. The jury might well have concluded beyond a reasonable doubt that appellant and others agreed to kill Zambito and that, in furtherance of the conspiracy, appellant ordered Flamkin to procure gloves from the hospital to keep fingerprints off the murder weapon. It was only necessary for the government to allege and prove one overt act in furtherance of the conspiracy.

▮ Even assuming that the verdict is facially inconsistent, it would not vitiate appellant's conviction for conspiracy. It is well-settled that "[j]uries in criminal cases in this country are free to render verdicts that are inconsistent or even the result of mistake or compromise." *United States v. Lichenstein*, 610 F.2d 1272, 1279 (5th Cir.), *cert. denied* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980). "Each count is separately considered and if it is supported by the evidence, may stand." *United States v. Romeros*, 600 F.2d 1104, 1105 (5th Cir. 1979), *cert. denied* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). There was ample evidence of a conspiratorial agreement to kill Zambito, of the appellant's knowing and willful participation in the conspiracy and of three overt acts committed in furtherance of the conspiracy.

### C. Disclosure of rebuttal alibi witnesses.

▮ Under Fed.R.Crim.P. 12.1(a), upon written demand of the attorney for the government, the defendant must disclose his intention to rely on an alibi defense and the names of all witnesses upon whom he intends to rely to establish the alibi. Rule 12.1(b) requires that the government reciprocate by furnishing to the defendant a list of witnesses who can place the defendant at the scene of the crime and a list of rebuttal alibi witnesses. Without a demand from the government, appellant furnished the attorney for the government a list of his alibi

---

sel to make a specific objection to any specific language. Counsel made no specific objections and did not move to exclude any details of the alleged homicides. In fact, it appears that appellant's attorney actually marked those portions of the transcript to be read to the jury including the foregoing passage. Furthermore, appellant has not pointed to this passage on appeal.

Appellant's general objection to the extrinsic evidence was not well-founded. The probative value was not substantially outweighed by its prejudicial effect. Since appellant's counsel failed to make a specific objection to inflammatory details when invited to do so and since he has not argued the point on appeal, we see no reason to disturb the district court's decision to admit the evidence.

4. *Accord United States v. Peltier*, 585 F.2d 314 (8th Cir. 1978), *cert. denied*, 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). In *Peltier*, the defendant was charged with the murder of two FBI agents. During the trial, the district court admitted into evidence that, at the time of the killings, there was an outstanding arrest warrant for the defendant on the charge of murder. The Eighth Circuit held that the trial judge did not err in admitting the evidence to show a motive for the defendant reacting with deadly force to attempts to arrest him. The court also held that the probative value of the evidence was not outweighed by its prejudicial effect because the government withheld many details of the murder and the trial court gave cautionary instructions.

witnesses and insisted that the government disclose its rebuttal witnesses. The government refused to disclose its witnesses on the ground that since it had not demanded appellant's alibi witnesses in the first place, it was under no duty to reciprocate. The district court adopted the government's argument.

We are faced with the question whether a defendant's gratuitous and unsolicited disclosure of alibi witnesses is sufficient to trigger the government's reciprocal obligation under Rule 12.1(b) to furnish rebuttal alibi witnesses. We do not believe that Rule 12.1 contemplates such a result. Discovery under Rule 12.1 was designed to be prosecution-triggered for the government's benefit in order that the government might obtain advance notice of an alibi defense to avoid unfair surprise and delays at trial. 8 Moore's Federal Practice ¶ 12.1.02; *United States v. Myers*, 550 F.2d 1036, 1042 (5th Cir. 1977). Since the government did not make a written demand under Rule 12.1(a), its reciprocal obligation under Rule 12.1(b) was not triggered. *See United States v. Savage*, 430 F.Supp. 1024, 1036 (M.D.Pa.), *aff'd mem.*, 556 F.2d 1170 (3d Cir. 1977), *cert. denied* 434 U.S. 1078, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978). The government was under no obligation to disclose its rebuttal alibi witnesses.

D. Admission of post-conspiratorial hearsay evidence.

■ As a part of appellant's case, he introduced the testimony of alleged co-conspirators John Barradale, a/k/a John the Barber, and Bobby Mulholland, who denied the existence of a conspiracy and appellant's participation in any conspiracy. In its rebuttal, the government introduced the testimony of Marion Pruitt to rebut Barradale's and Mulholland's testimony. Pruitt's testimony consisted of post-conspiratorial statements made to him by Barradale and Mulholland which tended to impeach their trial testimony. Appellant objected to the admission of Pruitt's testimony on the ground that it was post-conspiratorial hearsay. Appellant's objection is without merit.

■ The government introduced Pruitt's testimony to show prior inconsistent statements by Barradale and Mulholland for the purpose of impeaching them. Although post-conspiracy hearsay statements are inadmissible for the purpose of proving the truth of the matters asserted therein, they may be admissible for impeachment purposes. *See, e. g., United States v. Lemon*, 497 F.2d 854, 857 (10th Cir. 1974); *United States v. Stephens*, 492 F.2d 1367, 1376 (6th Cir.), *cert. denied* 419 U.S. 852, 95 S.Ct. 93, 42 L.Ed.2d 83 (1974). Although the trial judge should have instructed the jury as to the limited purpose for which the statements were admitted, appellant made no request for such an instruction. In any event, since Pruitt's rebuttal testimony was not lengthy and was merely cumulative of other evidence against appellant, the failure to give a limiting instruction was not a harmful error.

E. Failure to provide grand jury transcripts to appellant.

■ Appellant moved for disclosure of grand jury transcripts for the purpose of allowing his alibi witnesses to refresh their recollection as to what they had said before the grand jury. The district court denied his request but ordered the government to summarize the testimony of appellant's alibi witnesses. Ordinarily a long-established policy of secrecy surrounds grand jury proceedings and this policy can be overcome by the defendant only by a showing of a particularized need which outweighs the policy of secrecy. *See Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); *Douglas Oil Company of California v. Petrol Stops Northwest*, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). The decision to disclose or not to disclose grand jury proceedings is a matter within the trial court's discretion. *United States v. Procter & Gamble Co.*, 356 U.S.

677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). We do not believe that appellant has carried his burden of showing a particularized need for the grand jury transcripts. Accordingly, the district court did not abuse its discretion in overruling appellant's motion.

F. Sentencing procedure.

 Next appellant contends that his due process rights were violated because the trial judge, in the sentencing phase, considered hearsay reports implicating him in several other homicides. The reports consisted primarily of Zambito's sworn statements to police officers implicating himself as well as appellant in the homicides. A sentencing judge may consider evidence of other crimes not resulting in convictions when imposing sentences. *See United States v. Morgan*, 595 F.2d 1134 (9th Cir. 1979). The sworn statements by Zambito were sufficiently reliable so that the district court did not err in considering them.

G. Totality of the circumstances.

Finally, appellant asserts that the totality of the circumstances of the trial deprived him of a fair trial. Having failed to find reversible error in any of the alleged errors, we must conclude that appellant's argument is without merit. *See United States v. Callahan*, 588 F.2d 1078, 1089 (5th Cir.), *cert. denied* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979).

AFFIRMED.