902 F.2d 1570
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Richard MILLER (88-4080), Guy Leonard Prince
(88-4094), Jacinto Jose Banos (88-4095),
Defendants-Appellants.
 Nos. 88-4080, 88-4094 and 88-4095.
 United States Court of Appeals, Sixth Circuit.
 May 22, 1990.
 
 Before WELLFORD and ALAN E. NORRIS, Circuit Judges, and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants Miller, Prince, and Banos appeal their convictions stemming from an underlying conspiracy to possess cocaine for further distribution. Defendants urge numerous grounds for reversal: (1) that the jury's verdict was not unanimous; (2) judicial misconduct; (3) improper upward departure in sentencing; (4) unconstitutionality of the Sentencing Guidelines; (5) failure to charge the jury on entrapment; (6) failure to grant a motion to sever; (7) insufficient evidence; and (8) improper admission of evidence.
 
 I.
 
 2
 In November 1987, Arlis Frometa, an indicted coconspirator who is currently a fugitive, met with "Juan," a paid government informant. Juan was working with Mike Riccardo, an agent of the United States Customs Service in Miami who was preparing a sting operation. Juan's role was to act as a supplier from whom Frometa could purchase large quantities of marijuana.
 
 
 3
 Although the deal between Frometa and Juan was never consummated, during the course of negotiations Frometa asked Juan if he could supply him with cocaine. Frometa explained that he usually supplied "guys up North," but he needed to purchase an additional amount.
 
 
 4
 Frometa introduced Juan to Banos at Frometa's home in Miami. Following Agent Riccardo's instructions, Juan told Banos that he had cocaine to sell but that it was located in Columbus, Ohio. Banos told Juan that he was interested in a deal, that his friends could supply the necessary funds, and that he would fly to Columbus that evening.
 
 
 5
 Agent Riccardo and Juan flew from Miami to Columbus in order to meet Banos and his customers and, ostensibly, in order to obtain money for the cocaine. Simultaneously, Miller, Prince, and Banos traveled to Columbus. In a recorded conversation, Banos confirmed that he had enough money for ten kilograms of cocaine and that he would be able to obtain enough money for an additional five or six kilos.
 
 
 6
 Juan, accompanied by an undercover police officer, met with Banos in a Columbus hotel. Banos took Juan and the agent outside to a van, where he explained that the man in the passenger's seat, later identified as Miller, was the buyer and that the other man in the van, later identified as Prince, was the driver. Miller, Prince, and Banos showed Juan a large garbage bag filled with cash. Juan and the undercover officer left and other law enforcement officials arrested the defendants.
 
 
 7
 On February 18, 1988, the grand jury returned a six-count superseding indictment: Count 1 charged Miller, Prince, and Banos with violating 21 U.S.C. Sec. 846 (conspiracy to possess cocaine for further distribution); Counts 2 and 3 charged Banos and Miller with violating 18 U.S.C. Sec. 1952 (traveling in interstate commerce to carry on a business enterprise involving narcotics); Count 5 charged Banos with violating 21 U.S.C. Sec. 843(b) (using a communication facility to further the primary conspiracy); and Count 6 charged Miller and Prince with violating 18 U.S.C. Sec. 924(c) (carrying a firearm in furtherance of the primary conspiracy).
 
 
 8
 Following a jury trial, defendants were found guilty on all counts. All three defendants were sentenced to prison terms of 181 months.
 
 II.
 1. Alleged Judicial Misconduct
 
 9
 Defendants Prince and Banos contend that the district judge's behavior deprived them of a fair trial. See United States v. Hickman, 592 F.2d 931, 936 (6th Cir.1979). They claim that he adopted an antagonistic attitude towards them, that he impermissibly curtailed defense attorneys' questioning during voir dire, that he criticized their conduct during cross-examination, and that he adopted the role of "surrogate prosecutor."
 
 
 10
 This court has had prior occasion to review complaints concerning the trial judge's courtroom demeanor. Recognizing that he is a judge who requires meticulous observance of local court rules and courtroom etiquette, who "requires attorneys to frame questions properly and to refrain from testifying in the guise of asking questions," and who "sometimes shows his impatience with counsel," United States v. Frazier, 584 F.2d 790 (6th Cir.1978), we, nevertheless, did not hesitate to reverse a conviction where it appeared that his distinctive style prejudiced a defendant. See United States v. DiCarlantonio, Nos. 86-3941/42 (6th Cir. Sept. 30, 1987).
 
 
 11
 A review of the record reveals that the judge actively supervised the conduct of the trial. It records numerous interruptions, questions and unsolicited remarks, some of which could be construed as sarcastic or hostile. Although some of these comments may have been unnecessary, when one considers the nature of the interruptions and comments as opposed to their sheer quantity, we cannot conclude that defendants were prejudiced or that the jury was tainted. Defendants quote a number of the judge's comments out of context and unfairly characterize others as being directed against their interests. Other comments were directed at the prosecution, not defense counsel. Many were warranted in order to clarify questions and answers. As this court has noted in the past, judges, while expected to possess more than the average amount of self-restraint, are still only human. They do not possess limitless patience and ability to resist provocation. United States v. Worthington, 698 F.2d 820, 827 (6th Cir.1983) (citing United States v. Weiss, 491 F.2d 460, 468 (2d Cir.), cert. denied, 419 U.S. 833 (1974)).
 
 
 12
 A judge is charged with conducting a jury trial in an orderly fashion, ensuring that issues are not obscured, and acting with a view to eliciting the truth. After a careful review of the judge's behavior during this five-day trial, we are unable to say he departed from this charge to the extent that his conduct was so egregious as to be fairly capable of characterization as being beyond that necessary to fulfill his role of "governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." United States v. Tilton, 714 F.2d 642, 645 (6th Cir.1983) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)).
 
 
 13
 Counsel allude to the trial judge having sometimes conducted off-the-record bench conferences. The Court Reporters Act, 28 U.S.C. Sec. 753, embodies a mandatory rule requiring that all proceedings in criminal cases had in open court be recorded verbatim by shorthand or mechanical means. Furthermore, it is the duty of the court, not the attorneys, to make sure that the provisions of the Act are met. United States v. Gallo, 763 F.2d 1504 (6th Cir.1985). However, violation of the recording mandate is not per se error, requiring reversal. Defendants must demonstrate that they were prejudiced. Gallo, 763 F.2d at 1531.
 
 
 14
 In a later decision, we commented further on procedures involving "off-the-record" side-bar conferences in a case conducted by the same trial judge.
 
 
 15
 We do not read Gallo, however, to condone the regular practice of such off-the-record side-bar conferences. Indeed, requiring counsel to await the next recess to record his objections to the particulars of the last side-bar conference may well be prejudicial in that counsel may not recall exactly what was said during the conference or the exact nature of the error committed. Pressures of a heated criminal trial are not conducive to protecting defendant's rights under this procedure.
 
 
 16
 United States v. DiCarlantonio, Nos. 86-3941/42 (6th Cir. Sept. 30, 1987) (unpublished).
 
 
 17
 We cite this authority because it must have been clear to the district court that such "off-the-record" discussions are improper and strongly disfavored. The government did not respond in its brief to the complaint about the court's failure to record all the discussions and conferences that may have taken place during trial, perhaps because it was not separately set out by defendants as an assignment of error. At oral argument, counsel for the government did concede that this may have occurred. The burden is upon defendants, in any event, to demonstrate prejudice by reason of the error in failing to adhere to the requirements of 28 U.S.C. Sec. 753.
 
 
 18
 The district court may best recall the circumstances of such off-the-record conferences during the trial, and whether defendants, or any of them, were prejudiced by a failure to make a record of the rulings made, objections noted, or the like. We therefore must remand this case to the district court to address the effect of its failure to adhere to the requirements of 28 U.S.C. Sec. 753.
 
 2. Upward Departure
 
 19
 Defendant Banos, the only defendant to testify in his own defense, argues that the district court imposed a sentence essentially four levels in excess of the range prescribed by the Sentencing Guidelines.
 
 
 20
 The transcript of the sentencing reveals the basis for the court's departure:
 
 
 21
 The Court: The court will now state the offense level of C-87-200, the offense level is 30. The criminal history category is roman numeral I. The sentencing range is 97 to 121 months.
 
 
 22
 However, in this case the Court believes that an upward departure from the guidelines is appropriate. The Court finds that in the trial of this case this Defendant, in taking the stand, clearly perjured himself when he testified in this case and that this aggravating factor was not adequately taken into consideration by the sentencing commission in formulating the guidelines.
 
 
 23
 Pursuant to the sentencing reform act of 1984, it is the judgement of the Court that the Defendant, Jacinto Jose Banos, is hereby committed to the custody of the United States Attorney or his authorized representative to be imprisoned for a period of 181 months. This term consists of a term of 181 months on Count 1; a term of 60 months on Count 2; and a term of 48 months on Count 5; terms on Count 2 and 5 to run concurrently with the term imposed on Count 1.
 
 
 24
 Under 18 U.S.C. Sec. 3553(b), the sentencing court may impose a sentence greater than that provided by the range established by the Sentencing Guidelines if the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.
 
 
 25
 An upward adjustment of two levels is provided by the guidelines for a defendant who willfully obstructs the prosecution of his case by testifying untruthfully at his trial. Guideline Sec. 3C1.1. Even though perjury was taken into consideration when the Commission listed it as the basis for an adjustment, the district court still would have been warranted in departing from the guideline sentence, using Banos' perjury as the reason for the departure, if the court determined that, "in light of unusual circumstances" upward adjustment of two levels was inadequate. Guideline Sec. 5K2.0. Since the district court did not set out unusual circumstances, Banos' cause must be remanded for resentencing. Upon remand, in order to increase Banos' sentence more than the two levels allowed by the upward adjustment for obstruction of justice, the district court must be able to articulate how Banos' false testimony amounted to an obstruction of justice "to a degree" not taken into consideration by the Commission. Although we concede that it may not be impossible to conceive of the existence of such unusual circumstances, we confess that we are hard-pressed to picture them. See United States v. Sanchez Solis, 882 F.2d 693, 698-99 (2d Cir.1989).
 
 
 26
 In view of the remand directed, it may not be necessary that we address the remaining challenge made by defendants to the verdicts imposed. We do so, however, in the event the guilty verdicts are sustained after full consideration of the matters which are submitted to the district court on remand. We have also remanded for reconsideration of the sentences imposed.
 
 3. Poll of the Jury
 
 27
 Defendants assign as error the trial court's interrogating a juror whose response to a jury poll suggested lack of unanimity.
 
 
 28
 Three hours into its deliberations, the jury sent a note to the trial judge indicating that it was deadlocked at 11-1, and that the juror voting for acquittal "claimed there is nothing that could change his mind." The court advised the jury to continue deliberating and forty-five minutes later it returned a unanimous verdict of guilty on all counts.
 
 
 29
 According to the record, when the clerk conducted the poll and asked Juror No. 2 whether "the verdicts that I have just read into the record, are these your verdicts, sir?", he responded, "yes." However, at the conclusion of the poll, counsel for one of the defendants objected to discharging the jury since he thought that Juror No. 2 had indicated that only some of the verdicts were his. This colloquy ensued:
 
 
 30
 THE COURT: Mr. Odom, please stand, Juror No. 2.
 
 
 31
 Mr. Odom, when the Clerk asked you if the verdicts as just read into the record, were these your verdicts, did you say yes?
 
 
 32
 MR. ODOM: I said semi.
 
 
 33
 THE COURT: You said what?
 
 
 34
 MR. ODOM: Semi.
 
 
 35
 THE COURT: Did you sign--did you sign the verdict form?
 
 
 36
 MR. ODOM: I was talked into it. I was talked into it.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 THE COURT: All right. I'm going to send you back and continue your deliberations, and I'm going to bring you back into the Courtroom.
 
 
 40
 Now, I want to ask you a question, again. Stand up. You participated in the deliberations?
 
 
 41
 MR. ODOM: Yes, I did.
 
 
 42
 THE COURT: And after discussion, after the foreman of the jury sent the question out to the Court and I sent my answer back to continue your deliberations, you say you were talked into voting for a conviction?
 
 
 43
 MR. ODOM: Pretty much.
 
 
 44
 THE COURT: All right. But you did vote yes for conviction, is that correct? You did agree, you did vote yes for a conviction along with the other 11 members of the jury?
 
 
 45
 MR. ODOM: Not at first.
 
 
 46
 * * *
 
 
 47
 * * *
 
 
 48
 THE COURT: But you did finally?
 
 
 49
 MR. ODOM: Yes.
 
 
 50
 THE COURT: So your signature on the verdict form ... that is your signature? That means that you voted yes in accordance with the verdict form, is that correct?
 
 
 51
 MR. ODOM: Yes.
 
 
 52
 The court then discharged the jury, over the objections of defense counsel.
 
 
 53
 According to Fed.R.Crim.P. 31(d), if "upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or may be discharged." The rule reflects the right of a defendant in a federal criminal prosecution to have his guilt determined only by a unanimous verdict of his peers. Obviously, the requirement of unanimity would be encroached upon should a trial judge seek to secure a unanimous verdict by coercing a juror into surrendering his conscientiously held view that the defendant should be acquitted.
 
 
 54
 However, where a juror's response to a poll is ambiguous, it is incumbent upon the court, and consistent with Rule 31(d), to determine if, in fact, there was not unanimous concurrence. The case before us is not one where a juror, having indicated some reluctance to express concurrence during a jury poll, is required to cast a vote in open court. See, e.g., United States v. Sexton, 456 F.2d 961 (5th Cir.1972); United States v. McCoy, 429 F.2d 739 (D.C.Cir.1970); Matthews v. United States, 252 A.2d 505 (Ct.App.D.C.1969). Here, the juror was not coerced by the trial judge into casting a vote.
 
 
 55
 Instead, when it became evident that, in response to the poll, the juror had said, "Yes, semi," it was necessary to clarify the response. This the court did by first ascertaining what the juror meant by his response and then what vote he had actually cast. Once the juror explained that, while he did "[n]ot at first" vote with the other jurors, but "finally" did so after he was "[p]retty much" "talked into it," the court was warranted in concluding that the juror had arrived at his verdict through the type of deliberative process in which juries are expected to engage; that he had in fact voted for a verdict of guilty and had not changed that vote when polled; and that the jury unanimously concurred in the verdict.
 
 
 56
 It may have been the better course to allow the attorneys on both sides to question the particular juror, separate from the other jurors, but considering all the circumstances, we find no error--no abuse of discretion in the action of the district court.
 
 
 57
 4. Constitutionality of the Sentencing Guidelines
 
 
 58
 The contention of defendant Prince, that the guidelines promulgated under the Sentencing Reform Act violate the Due Process Clause of the Fifth Amendment, is without merit in view of our decision in United States v. Jacobs, 877 F.2d 460 (6th Cir.1989).
 
 
 59
 5. Failure to Charge Jury with Entrapment Defense
 
 
 60
 Defendants Banos and Miller contend that the district court's refusal to charge the jury with an instruction on entrapment constitutes reversible error. We disagree.
 
 
 61
 The Supreme Court recently reiterated the general proposition that a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. Mathews v. United States, 485 U.S. 58 (1988).
 
 
 62
 Although entrapment is usually a question of fact, the district court has the duty of determining whether there is sufficient evidence to warrant the instruction or whether the issue can be resolved as a matter of law. Where the evidence is in dispute, the entrapment defense must be submitted to the jury. United States v. Carroll, 518 F.2d 187, 188 (6th Cir.1975). By the same token, if the undisputed evidence demonstrates that no entrapment was evident, i.e., government agents did not engage in conduct which "overbears an otherwise innocent person's will and thereby induces him to commit a criminal act that he was not disposed to commit," the defense is inappropriate as a matter of law. United States v. Ambrose, 483 F.2d 742, 746 (6th Cir.1973).
 
 
 63
 Banos and Miller assert a rather unique theory of entrapment. They argue that they were entrapped not because they did not conspire to do something, but because they did not conspire to do what the government wants to make it appear that they were doing. Their argument is, essentially, that while they engaged in behavior which could appear, after the fact, to be a cocaine distribution, their intent was really to perpetrate a fraud. Although Miller and Banos admit that they intended to "rip off" their coconspirators, they argue, nonetheless, that they were entrapped into engaging in one criminal act when they really only intended to engage in another, less serious offense.
 
 
 64
 Our primary focus is on defendants' predisposition to commit the crime rather than on the government agents' actions. United States v. Fleishman, 684 F.2d 1329, 1342 (9th Cir.), cert. denied, 459 U.S. 1044 (1982). While only slight evidence is necessary to create a triable issue of fact, the evidence must at least suggest that defendants were initially unwilling to commit the crime, or that the government involvement planted the criminal design in defendants' minds. Id. After reviewing the record, we are unable to find any evidence at all suggesting either that defendants were initially unwilling to commit the crime or that the criminal design was planted by the government.
 
 
 65
 Despite their argument that they were entrapped into participating in a "real" crime rather than the fraud they intended, the focus is on their predisposition to engage in criminal conduct, and not on their reasons for participating in the conspiracy. An argument which merely challenges the purpose of the conspiracy while admitting its existence is insufficient to warrant an entrapment instruction.
 
 6. Failure to Grant Motion to Sever
 
 66
 Prince contends that it was prejudicial error to require him to stand trial jointly with Banos and Miller and to deny his motion to sever Count 6 of the superseding indictment from the principal charge. As we are unable to say that the district court abused its discretion in either regard, the contention is without merit.
 
 
 67
 In order to warrant reversal, Prince must make a strong showing of prejudice. United States v. Bibby, 752 F.2d 1116, 1123 (6th Cir.1985), cert. denied, 475 U.S. 1010 (1986). It is not sufficient that he merely asserts that evidence linking him to the conspiracy was weak and the jury was, therefore, confused as to the extent of his actual participation. The jury is presumed capable of sorting out the evidence and considering each defendant separately. United States v. Franks, 511 F.2d 25, 30 (6th Cir.), cert. denied, 422 U.S. 1042 (1975).
 
 
 68
 The trial court joined all counts after concluding, in accordance with Fed.R.Crim.P. 8(a), that they were all committed in furtherance of the conspiracy. Because Count 1 presented the underlying conspiracy, and Count 6 charged defendant with carrying a weapon in furtherance of the conspiracy, the district court was warranted in concluding that these two counts were part of the same series of acts.
 
 
 69
 7. Insufficient Evidence to Support a Verdict
 
 
 70
 Defendant Miller contends that there was insufficient evidence to support the jury's verdict that he possessed a firearm in furtherance of the conspiracy, since the gun was not found on his person but was located in the van equidistant between himself and another defendant.
 
 
 71
 Reviewing the evidence in a light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), we conclude that there was sufficient evidence to infer possession. Miller was seated in the front seat of the van and the semi-automatic pistol was on the console next to him. He was observed sitting in the passenger's seat of the van for one hour prior to his arrest and before Banos accompanied Juan to the van. Inside the van was a large quantity of cash, cocaine residue, and a cocaine testing kit. It was not unreasonable for the jury to conclude that the gun was intended to protect both the large quantities of cash and drugs involved in the transaction, an inference which supports the conclusion that Miller violated a statute which prohibits the possession of a firearm in furtherance of drug trafficking.
 
 8. Improper Admission of Evidence
 
 72
 Miller argues that the district court abused its discretion by permitting a witness to testify that in the past she had received and purchased cocaine from him and had seen a large quantity of cocaine in his home.
 
 
 73
 Miller argues that the testimony violates Fed.R.Evid. 404(b)'s prohibition against using evidence of his character for the purpose of showing that, in pursuing the course of conduct with which he was charged, he was acting in conformity with that character trait. However, the testimony was admitted to show that Miller was engaged in a continuing course of conduct, an element of the government's proof in demonstrating his participation in a business enterprise involving narcotics, in violation of 18 U.S.C. Sec. 1952. Rule 404(b) contemplates admission of this type of evidence "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Because the evidence was admitted to show a continuous plan of engaging in the business of selling cocaine, the testimony was the kind of "other acts" evidence contemplated by the rule.
 
 
 74
 We cannot say that the district court abused its discretion in concluding that the evidence's probative value outweighed any potential prejudice. An important indication of the probative value of evidence is the prosecution's need for the evidence in proving its case. United States v. Vance, 871 F.2d 572, 576 (6th Cir.), cert. denied, 110 S.Ct. 323 (1989) (citing United States v. Benton, 637 F.2d 1052, 1057 (5th Cir.1981)). The only way in which the prosecution could prove that the present sale was not an isolated act was by showing that Miller had previously engaged in such behavior.
 
 III.
 
 75
 With the exception of possible reversible error resulting from failure to record bench conferences and the matter of sentencing, none of the defendants' assignments of error is grounds for reversal. However, these cases are remanded to afford defendants an opportunity to demonstrate prejudice from the district court's failure to comply with 28 U.S.C. Sec. 753. Since Banos' sentence may not have been proper under the Sentencing Guidelines, his cause is also remanded for resentencing.